AO 91 (REV.5/85) Criminal Complaint

AUSA Carrie E. Hamilton (312) 353-4558
AUSA Laurie J. Barsella (312) 353-6069

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JOHN BILLS

**CRIMINAL COMPLAINT**

CASE NUMBER: 14 CR 135

**UNDER SEAL**

*FILED*

*MAY 13 2014*

*MAGISTRATE JUDGE MARIA VALDEZ*
*UNITED STATES DISTRICT COURT*

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief:

From no later than late 2002 to no earlier than June 2011, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, JOHN BILLS, being an agent of the City of Chicago, a local government that received in excess of $10,000 in federal funding in each twelve-month period from 2002 through 2011, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept things of value, namely, cash payments and other personal financial benefits, intending to be influenced and rewarded in connection with any business, transaction, and series of transactions of $5,000 or more, of the City of Chicago, namely contracts for the Digital Automated Red Light Enforcement Program, in violation of Title 18, United States Code, Section 666(a)(1)(B).

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Brian J. Etchell
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

May 13, 2014

Chicago, Illinois
City and State

Maria Valdez, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

## **AFFIDAVIT**

I, Brian J. Etchell, being duly sworn, state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since 2003. As part of my duties as an FBI Special Agent, I investigate criminal violations relating to public corruption offenses.

2.     I have participated in the investigation of the below-described offense. The facts set forth below are based upon my own personal observation of events described, upon my review of reports written by others involved in the investigation, including but not limited to agents of the Federal Bureau of Investigation and the Internal Revenue Service and investigators of the City of Chicago-Office of Inspector General, my conversations with other law enforcement agents, my review of documents, and upon information from cooperating witnesses and other witnesses.

3.     On the basis of this information, and the facts alleged below, I submit there is probable cause to believe that, from no later than late 2002 to no earlier than June 2011, JOHN BILLS, being an agent of the City of Chicago, a local government that received in excess of $10,000 in federal funding in each twelve-month period from 2002 through 2011, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept things of value, namely, cash payments and other personal financial benefits, intending to be influenced and rewarded in connection

1

with any business, transaction, and series of transactions of $5,000 or more, of the City of Chicago, namely contracts for the Digital Automated Red Light Enforcement Program, in violation of Title 18, United States Code, Section 666(a)(1)(B).

4.     Since this Affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not included each and every fact known to me concerning this investigation. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part and are not verbatim.

### Red Light Program

5.     In October 2003, the City of Chicago awarded a contract (PO 3220) to Redflex Traffic Systems, Inc. (Redflex) for the installation, maintenance and operation of the City's first Digital Automated Red Light Enforcement Program (DARLEP).  DARLEP uses cameras to automatically record and ticket drivers who run red lights.

6.     PO 3220 was expanded at least three times before finally ending in October 2008.  From 2004 to 2008, the City paid Redflex approximately $25 million pursuant to PO 3220.  In return, Redflex installed 136 camera systems in Chicago intersections, maintained those systems, and assisted in the review and processing of the violations.

7.     Redflex was awarded PO 3220 through a City-run Request for Proposal (RFP) process.    Redflex and another competitor were the two finalists, and Redflex won the contract following a one-month trial run of the competing systems.    JOHN BILLS, then-Assistant Commissioner with the Department of Transportation, was a voting member of the RFP evaluation committee that evaluated the proposals and recommended awarding the contract to Redflex.

8.     In February 2008, the City awarded Redflex a new contract, PO 18031, for the operation and maintenance of the approximately 136 camera systems already installed under PO 3220.    PO 18031 was "sole-sourced," meaning that it was awarded to Redflex without a competitive procurement process.  From 2008 to present, the City has paid Redflex approximately $33 million pursuant to PO 18031.

9.     On February 21, 2008, following an RFP process, the City awarded DARLEP Contract 16396 to Redflex.    Contract 16396 was essentially the same as the original DARLEP contract to install, operate and maintain the City's red light cameras.  BILLS was an advisory member of the RFP evaluation committee that selected Redflex as the City's preferred vendor.  Thus far, the City has paid Redflex approximately $66 million in connection with DARLEP Contract 16396.    Approximately 248 red light camera systems were installed under DARLEP Contract 16396, bringing the

3

total number of red light camera systems installed by Redflex to 384, and the total amount the City paid Redflex to approximately $124 million. According to individuals at Redflex, the Chicago contract was the most important contract for the company, both because of the revenues it generated as well as the name recognition it gave to Redflex. By 2010, the Chicago red light program was the largest red light camera program in the United States and encompassed 20% of the total camera systems that Redflex operated in the U.S.

10. According to information provided by a City official, as well as public information electronically available, the City received far in excess of $10,000 in federal funding for each calendar year 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010 and 2011.

## JOHN BILLS

11. JOHN BILLS was an employee of the City of Chicago. According to City personnel records, BILLS was a City employee from June 29, 1979, until he retired on June 30, 2011. BILLS' job title at the time he retired was Managing Deputy Commissioner with the City's Department of Transportation (CDOT). BILLS was an agent of the City during the entirety of his employment with the City.

12. According to individuals interviewed in this investigation and City records, BILLS managed the City's DARLEP from the time the RFP was

4

initiated in late 2002 until he retired in 2011. BILLS served as a voting member on the 2003 DARLEP RFP evaluation committee and served as an advisory, non-voting member on the 2007 DARLEP RFP evaluation committee.

## INDIVIDUAL A

13.     According to Redflex documents and interviews, Redflex hired INDIVIDUAL A as an independent contractor in November 2003. INDIVIDUAL A maintained this position until he was terminated for cause by Redflex on November 16, 2012, for refusing to meet and cooperate with Redflex's counsel in connection with Redflex's internal investigation regarding City of Chicago matters. Over the course of his relationship with Redflex, INDIVIDUAL A was paid over $2 million dollars in salary and bonuses, as well as commissions. According to Redflex personnel, if INDIVIDUAL A had been hired as an employee rather than a contractor, INDIVIDUAL A would have been one of the highest paid employees in the entire company.

## Information from Confidential Source

14.     From 2013 to the present, a Confidential Source (CS1)[1], who has agreed to testify, has been interviewed by law enforcement and provided the following information:

15.     In 2002, CS1 was hired to work for Redflex. In late 2002, CS1 gave a presentation to BILLS, who was then employed at CDOT, regarding Redflex's red light camera systems, which led to frequent communications between BILLS and CS1.

16.     CS1 provided BILLS with an unsolicited proposal from Redflex to install red light cameras in the City of Chicago. CS1 also provided BILLS with sample ordinances that needed to be passed in Illinois to allow the cameras. By the end of 2002, CS1 believed that the City of Chicago was heading toward issuing an RFP for red light cameras. CS1 provided BILLS with a sample RFP to use as a reference.

17.     BILLS told CS1 that BILLS' superior at the City of Chicago had been paid money from an engineering firm related to another City of Chicago contract that the superior oversaw. CS1 later understood that BILLS told this to CS1 in an effort to determine whether BILLS would be able to get

---

[1] In December 2012, the City of Chicago Office of Inspector General compelled CS1 to sit for an interview, pursuant to Redflex's contract with the City. During that interview, CS1 provided some of the information contained herein. In February 2013, the U.S. Attorney's Office for the NDIL gave CS1 letter immunity and thereafter, CS1 provided detailed information to federal law enforcement about Redflex corruption in Chicago and elsewhere. In February 2014, CS1 entered into a Pre-Trial Diversion Agreement in another district based on corruption in which CS1 had been involved in that district. CS1 has no other criminal history.

money from Redflex in return for getting Redflex the red light camera contract.

18. According to City of Chicago records, on January 3, 2003, CS1 attended a pre-bid meeting at CDOT for vendors interested in the City of Chicago's red light camera RFP. CS1 was present on behalf of Redflex at the meeting, along with representatives from a number of Redflex competitors.

19. Shortly after the pre-bid meeting, BILLS contacted CS1 and asked CS1 to get him and his friends a hotel room in Los Angeles. CS1 understood that BILLS was asking CS1 to pay for the hotel room, which CS1 ultimately did.

20. With the approval of CS1's superior, CS1 paid for BILLS' hotel room because CS1 believed at the time that it would influence BILLS to help Redflex get a contract with the City of Chicago. CS1 checked BILLS and his friends into the hotel room in Los Angeles. As CS1 anticipated, BILLS did not offer to and did not reimburse CS1 for the hotel room and instead thanked CS1 for the hotel room. CS1 submitted the voucher for the hotel room to CS1's supervisor at Redflex and was reimbursed by Redflex.

21. In approximately February 2003, Redflex was selected, along with a competitor, to be part of a pilot phase, in which the two vendors competed for the City of Chicago's red light camera contract.

22.    In February 2003, BILLS met at the John Hancock Center after business hours with CS1 and others from Redflex and discussed specific ways in which Redflex could be awarded the DARLEP contract.  In approximately May 2003, CS1 and others from Redflex met with BILLS on about two other occasions outside of work in order to make BILLS a "Redflex expert" so that he could convince the City's evaluation committee to recommend that Redflex be awarded the contract.  During this period of time, Redflex paid for drinks and meals for BILLS.  Expense reports, flight records and emails corroborate that these meetings took place.

23.    Early in the pilot phase, BILLS had recommended that Redflex hire Company A, which was owned by Subcontractor A, as a subcontractor. In order to ensure that BILLS supported Redflex in its efforts to be awarded the City of Chicago contract, Redflex hired Company A.

24.    At the conclusion of the pilot phase, in May 2003, the red-light camera RFP evaluation committee was scheduled to meet and recommend a winner.  BILLS told CS1 that BILLS had the power to get Redflex the contract by influencing fellow committee members.

25.    Before the contract was awarded, BILLS made comments to CS1 about the efforts that Redflex's main competitor was making in order to win the City contract.   For example, BILLS said that an employee of the competitor had offered BILLS money, possibly $100,000, if BILLS would help

the competitor be awarded the contract. CS1 understood that BILLS made these types of comments to remind CS1 that BILLS' assistance was necessary in order for Redflex to win the red light camera contract, and that BILLS was being courted by Redflex's competitor.

26.     Days prior to the scheduled meeting of the evaluation committee on May 27, 2003, CS1 was in Chicago in order to prepare BILLS for the meeting and continue to make BILLS a "Redflex expert." Travel records and emails confirm that CS1 was in Chicago on May 26, 2003. That day, BILLS invited CS1 to come with BILLS to a CDOT building after hours. BILLS, CS1 and Subcontractor A went to the CDOT building after hours. Subcontractor A corroborates that he went with CS1 and BILLS to the CDOT building after hours, however, Subcontractor A left early and does not know what CS1 and BILLS did.

27.     According to CS1, while at the CDOT building that evening, BILLS and CS1 reviewed red light photographs taken during the pilot phase by Redflex and its competitor. For both Redflex and its competitor, there were photographs that showed equipment working well in some instances and poorly in others. CS1 and BILLS selected photographs that showed Redflex cameras working well, and the competitor's cameras working poorly. BILLS said that he planned to show the selected photographs the next day during the evaluation committee's meeting, and would pretend that the

9

photographs were chosen randomly. CS1 understood that by BILLS doing this, Redflex would have an advantage over its competitor and therefore had a much greater chance of being recommended by the evaluation committee.

28.　According to CS1, BILLS wrote out name placards for each member of the committee and arranged the seating in a particular way to control the voting order. Specifically, BILLS told CS1 that he had arranged the seating so that committee members BILLS knew would support Redflex would vote first, and these votes would influence the members who would vote later in the process.

29.　The committee met the following day and subsequently issued a memorandum dated May 27, 2003 recommending Redflex as the contractor of choice for the DARLEP contract. After the evaluation committee made its unanimous recommendation, it was sent to the Commissioner of CDOT for his concurrence. The concurrence was made on May 27, 2003. The recommendation and concurrence were then sent to the Chief Procurement Officer of the City to begin to negotiate the specifics of the red light camera contract. In October 2003, Redflex's red light camera contract with the City of Chicago went into effect.

30.　In June of 2003, a dinner took place in Los Angeles to celebrate Redflex winning the contract. CS1 and other Redflex employees attended the celebration, along with BILLS and Subcontractor A. The night of the dinner,

BILLS told CS1 words to the effect of, "It's time to make good." CS1 understood this to mean that BILLS wanted and expected to be paid for helping Redflex win the Chicago red light camera contract.

31. BILLS discussed how much money he wanted and how he would be paid. BILLS mentioned $100,000 or $200,000 and said the proposed amounts were based on the size of the red light contract. BILLS suggested two different ways that Redflex could make payments to BILLS. BILLS suggested that Subcontractor A could overbill Redflex and then Subcontractor A would get the money to BILLS. BILLS also suggested that Redflex could pay BILLS through Redflex's newly created Chicago customer liaison position. This position was subsequently given to INDIVIDUAL A, who was a personal friend of BILLS.

32. CS1 told BILLS he would need to talk with his superiors about BILLS' request. According to CS1, after talking with BILLS, CS1 did have discussions with his superiors about how much money BILLS wanted and the manner by which Redflex would pay him.

33. In May 2003, Redflex had placed an ad in a Chicago newspaper seeking an Account Manager for Redflex's City of Chicago contract. According to Redflex records and interviews, INDIVIDUAL A interviewed for the position in July 2003 and was the only individual Redflex interviewed for the position.

11

34. According to CS1, and confirmed through Redflex documents, between approximately July and November 2003, Redflex negotiated and finalized a consulting contract with INDIVIDUAL A. According to CS1, CS1 and his superiors had explicit conversations about INDIVIDUAL A serving as a conduit to get money to BILLS in return for BILLS' help in getting Redflex the City of Chicago contract, and for BILLS' help in ensuring that Redflex's contract would potentially be expanded and renewed in the future.

35. At about the time that Redflex was negotiating a consulting contract with INDIVIDUAL A, Redflex was also in negotiations with the City Procurement Department regarding the terms of the DARLEP contract. In about October 2003, BILLS helped Redflex significantly by going against the advice of the City of Chicago's Corporation Counsel and capping liquidated damages in Redflex's DARLEP contract.

36. According to CS1, and as confirmed by Redflex interviews and documents, INDIVIDUAL A's consulting contract with Redflex, which went into effect on November 3, 2003, provided a unique payment structure for his position as a consultant. According to CS1, and as confirmed by a review of the contract, INDIVIDUAL A received a regular salary of $2,300 twice a month (which was increased to $2,500 in 2007), a $5,000 bonus every six months, as well as commissions. INDIVIDUAL A's contract with Redflex was written such that the bulk of its value was generated from commissions on

12

what was referred to as "out-of-scope" work, meaning not directly related to the initial number of red light camera systems, but instead related to additional red light camera installations and additional work in the maintenance of the cameras in the City of Chicago.

## "Out of Scope" Payments to INDIVIDUAL A

37.    A review of Redflex payments to INDIVIDUAL A reflects that INDIVIDUAL A received over $2 million from 2003 to 2011. From late 2003 through 2006, INDIVIDUAL A received approximately $175,000 in salary payments (approximately $60,000 per year), $35,000 in reimbursed expenses, and $85,000 in bonuses and commissions.    Between 2007 and 2011, INDIVIDUAL A received approximately $290,000 in salary payments, $12,000 in reimbursed expenses, and the following in bonuses and commissions: $87,400 (2007), $342,026 (2008), $515,046 (2009), $193,205 (2010) and $289,757 (2011).    In mid-2007, Redflex also increased INDIVIDUAL A's salary from $2,300 to $2,500 twice a month.

38.    According to Redflex documents, CS1 and his superiors rejected requests from other Redflex employees to alter the terms of INDIVIDUAL A's contract in a way that would have been more financially beneficial for Redflex, and also directed employees to interpret the contract such that it was consistently in INDIVIDUAL A's financial favor (as opposed to Redflex) throughout the course of his relationship with Redflex.

13

## BILLS' Requests for Other Financial Benefits

39.     Over the course of Redflex's contract with the City of Chicago, BILLS made numerous requests to CS1 for different kinds of financial benefits.  CS1 does not recall ever denying a request made by BILLS.  CS1 obliged BILLS' requests in exchange for BILLS doing what he could in his position with the City of Chicago to make sure that Redflex kept and expanded its 2003 contract with the City of Chicago and obtained additional contracts with the City in the future, including the 2007 red light contract.

40.     In 2004 and 2007, BILLS asked CS1 for computers.  In response, in 2004, CS1 gave BILLS a laptop.  In 2007, CS1 purchased BILLS a new computer, and CS1 and INDIVIDUAL A personally delivered that computer to BILLS' home.  Internal Redflex documents confirm that CS1 received approval from CS1's superior to give BILLS a laptop in 2004 and confirm that in 2007, CS1 purchased a computer and expensed the purchase to Redflex.

41.     From 2003 through 2011, at BILLS' request, CS1 paid for numerous items for BILLS, including hotel rooms, car rentals, meals, golf games and other personal items and expensed them through Redflex.  Most of the expenses were the result of requests made directly by BILLS to CS1, although occasionally, the requests came to CS1 through INDIVIDUAL A, for the benefit of BILLS.  Redflex documents reflect that CS1 and others at

Redflex expensed at least $23,000 worth of hotels, car rentals, meals, golf games and other personal items for BILLS.

## 2007 Red Light Camera Contracts

42.     In approximately 2007, Redflex was trying to win two red light camera contracts with the City of Chicago. The City initially was going to have only one all-inclusive contract that was "sole sourced," but then split it into two contracts -- one contract for maintenance of previously installed camera systems, and another for the installation of additional camera systems. Redflex wanted the RFPs for the City contracts to be written as "sole sourced," meaning that only Redflex could get the contracts. CS1 and others from Redflex helped write documents that were given to BILLS, which BILLS then used to get the maintenance contract "sole sourced" and awarded to Redflex.

43.     For the other contract regarding the additional camera installations, BILLS asked Redflex to help write the specifications for the upcoming RFP. INDIVIDUAL A sent CS1 and CS1's superior a draft RFP and they inserted specific language to help Redflex win the contract.

44.     According to the camera installation RFP, the two top-rated candidates would compete against one another in a head-to-head pilot phase, similar to how Redflex competed against its main competitor in 2003. However, the RFP stated that if the top candidate was rated substantially

higher than the second-highest rated candidate, the City would not conduct a subsequent head-to-head competition. Instead, the highest rated bidder would win the contract outright. At the time the RFP for the installation contract was issued, or shortly thereafter, Redflex provided INDIVIDUAL A and BILLS with a rating scale and rating criteria for the City's evaluation committee to use when rating the bidders. The rating criteria were written so that Redflex would not only receive the highest rating, but would be rated substantially higher than the second-highest candidate, thus avoiding a head-to-head competition. BILLS said that the evaluation committee would use these criteria.

45. In 2007, BILLS was part of the evaluation committee, but was not a voting member. BILLS told CS1 that he could still direct the vote of the committee. Prior to the evaluation committee's vote, BILLS went over the list of voting members with CS1, claiming for each voting member that BILLS had secured that member's vote for Redflex.

46. In November of 2007, the evaluation committee unanimously voted for Redflex to win the camera installation contract.

### BILLS Retires From City

47. On June 30, 2011, BILLS retired from the City of Chicago. Prior to his retirement, BILLS made it known to CS1 and other Redflex employees that he wanted a job with Redflex. In May of 2011, CS1 was part of a

meeting with several other Redflex employees at Redflex's office in Arizona where they discussed the possibility of hiring BILLS. It was decided that Redflex could not directly hire BILLS due to a City of Chicago ordinance. The ordinance prohibits City contractors from hiring City employees who exercised contract management authority until one year after the employee's departure from the City.

48. A subsequent meeting was held in Chicago between BILLS, CS1, and others from Redflex. Subsequently, Redflex arranged for BILLS to get a job with Company B, which was funded by Redflex. Redflex employees and documents confirm that once Company B hired BILLS, Redflex increased its monthly contribution to Company B to help pay for BILLS' salary.

49. After BILLS received a job with Company B, CS1 was told by CS1's superiors that Redflex did not want to "double pay" BILLS, and as such, would no longer pay INDIVIDUAL A his commissions. Instead, CS1's superiors decided that the commissions would accrue on Redflex's books, and not be paid. CS1 later informed BILLS that the commissions to INDIVIDUAL A were going to stop now that BILLS had been hired by Company B.

50. Redflex documents confirm that commissions accrued to INDIVIDUAL A beginning in November 2011 were not paid to him. As a result, after BILLS retired from the City and began working for Company B,

17

Redflex did not pay INDIVIDUAL A approximately $56,000 worth of "out of scope" payments earned under the contract.

51.    In approximately the early spring of 2012, Company B terminated BILLS.    BILLS then continued to suggest ways by which Redflex could compensate him, including asking if Redflex would hire BILLS' then girlfriend.  Although CS1 raised this possibility internally at Redflex, Redflex declined to hire BILLS' girlfriend.

52.    Based on interviews and internal Redflex documentation, around the time of BILLS' retirement from the City of Chicago, high-level Redflex employees questioned INDIVIDUAL A's continued value to Redflex.    These individuals also questioned whether INDIVIDUAL A's contract should be terminated in light of BILLS' retirement from the City.

### INDIVIDUAL A Funneling Redflex Funds to Bills

53.    From late 2003 through November 2012, INDIVIDUAL A's primary source of income was Redflex.  As detailed below, investigation to date has uncovered that INDIVIDUAL A and BILLS utilized several methods by which INDIVIDUAL A transferred funds to BILLS.    In 2008, INDIVIDUAL A purchased a condominium in Arizona for BILLS' use.  In addition, checks written on INDIVIDUAL A's bank account were used to repay debts BILLS had accumulated and also to pay for personal expenses of BILLS and his family.  INDIVIDUAL A also withdrew large amounts of cash

18

which temporally correspond to BILLS' repayment of loans as well as BILLS' payment of numerous personal expenditures with cash. Although BILLS also paid for other personal expenditures with cash which do not temporally correspond to a specific withdrawal by INDIVIDUAL A, BILLS' financial records reflect no withdrawals of cash by him to support the personal expenditures. To the contrary, records reflect very little cash on-hand by BILLS during this time period.

### INDIVIDUAL A's Purchase of Arizona Condo for BILLS

54.     Records show that on March 7, 2008, BILLS flew with his wife from Chicago to Phoenix.

55.     On or about March 9, 2008, BILLS and his wife looked at a condo unit that was for sale in Gilbert, Arizona (the "Arizona Condo"). In the process of viewing the Arizona Condo that day, BILLS indicated to the seller (Property Owner A) that he was purchasing the Arizona Condo for his father-in-law and said that his father-in-law's name was INDIVIDUAL A. In addition, BILLS and his wife talked about installing new granite countertops in the kitchen and that their daughter, who was preparing to attend a nearby university, would be able to stay at the Arizona Condo. At the conclusion of their viewing, BILLS accepted the asking price of $177,000 without negotiating. Property Owner A reported that he/she never saw BILLS or

BILLS' wife contact BILLS' father-in-law or anyone else prior to agreeing to purchase the Arizona Condo.

56. On or about March 10, 2008, BILLS met Property Owner A at the Arizona Condo and gave him/her an escrow check written from INDIVIDUAL A's bank account for $2,000 made payable to the title company. Based on what BILLS said the day before, Property Owner A believed that INDIVIDUAL A was the name of BILLS' father-in-law.

57. Records show that on March 10, 2008, BILLS flew from Phoenix to Chicago.

58. On March 13, 2008, a personal check for $2,000 from INDIVIDUAL A to the title company dated March 10, 2008 cleared INDIVIDUAL A's bank account.

59. On May 8, 2008, records show that INDIVIDUAL A completed the purchase of the Arizona Condo with a $76,125.11 down payment and financed the remainder by means of a $102,000 mortgage.

60. On May 30, 2008, INDIVIDUAL A sent a fax to the clubhouse for the Arizona Condo stating that he was relinquishing his clubhouse membership to BILLS.

61. Numerous friends and relatives of BILLS have identified the Arizona Condo as a property at which they stayed with BILLS and which they believed BILLS owned, based on statements made by BILLS and/or the

manner in which he acted in regards to the Arizona Condo. For example, one of BILLS' family members told law enforcement that in or about June 2008, he/she and another family member flew from Chicago to Phoenix and stayed at the Arizona Condo. BILLS told this family member that BILLS owned the Arizona Condo. During that trip, this family member went with BILLS to purchase furniture for the Arizona Condo, which at that point was sparsely furnished.

62.    According to a friend of BILLS, BILLS used to vacation at this friend's properties located near Phoenix, Arizona. In or about 2008, BILLS told this friend that BILLS purchased the Arizona Condo and never stayed at this friend's properties again.

63.    Numerous family members have also stated that BILLS kept a Mercedes convertible at the Arizona Condo. One family member stated that BILLS directed him/her to take care of the Mercedes for BILLS when BILLS was not in Arizona. In order to obtain the key to BILLS' Mercedes, this family member entered the Arizona Condo by means of a security code BILLS gave him/her to the Arizona Condo's garage door. In or about 2010, Property Owner A saw BILLS working on a convertible Mercedes in the Arizona Condo's garage.

64.    Records show that on October 13, 2009, BILLS ordered the transport of a 2000 Mercedes CLK 320 from BILLS' Chicago home to the

21

Arizona Condo. Records show that the Mercedes was scheduled to be picked up from Chicago on October 14, 2009 and delivered to the Arizona Condo on October 18, 2009. Records show that BILLS flew from Chicago to Phoenix on October 16, 2009 and returned to Chicago from Phoenix on October 19, 2009.

65. Contained in BILLS' emails is a picture of BILLS' girlfriend in front of the Arizona Condo clubhouse, as well as a picture of BILLS with the Mercedes near the Arizona Condo clubhouse.

66. On March 28, 2011, BILLS phoned Property Owner A, said that the Arizona Condo's air conditioning was not working, and asked for a recommendation for a repairman. Property Owner A gave BILLS the phone number of a repairman. Records confirm phone contact on March 28, 2011, between BILLS and Property Owner A, BILLS and INDIVIDUAL A, as well as BILLS and the repairman.

67. Records show that BILLS flew from Chicago to Phoenix on March 30, 2011 and returned to Chicago from Phoenix on April 5, 2011.

68. Records show that a check dated March 31, 2011 for $2,796.33 from INDIVIDUAL A's bank account to the repairman with a note "A.C. Condo."

69. From May 2008 (when the Arizona Condo was purchased) through 2012, records reflect at least 22 trips by BILLS to Arizona. Records

22

reflect BILLS' girlfriend traveled with BILLS to Arizona at least seven times during this same period.

70.     Witness interviews have confirmed that INDIVIDUAL A traveled to Arizona for business as Redflex is headquartered in the Phoenix-area. From 2008 through 2012, records reflect that INDIVIDUAL A took very few trips to Arizona.  After the purchase of the Arizona Condo, INDIVIDUAL A continued to stay in hotels when he traveled to Arizona.

71.     In 2009, INDIVIDUAL A and Real Estate Agent 1 spoke at their high school reunion.  Real Estate Agent 1 gave INDIVIDUAL A his business card and told INDIVIDUAL A that he was a real estate agent in Arizona. INDIVIDUAL A never mentioned that he owned a condo in Arizona.  The next time Real Estate Agent 1 heard from INDIVIDUAL A was in 2013, when INDIVIDUAL A called and asked him to sell the Arizona Condo.

72.     In March 2013, Real Estate Agent 1 met INDIVIDUAL A at the Arizona Condo and was signed as the listing agent.  By this time, the Chicago Tribune had published newspaper articles about Redflex, BILLS and INDIVIDUAL A.

73.     The sale of the Arizona Condo closed on July 19, 2013, for $149,900.  From the proceeds of the sale of the condo, $40,475.25 went to pay off the balance of the mortgage that INDIVIDUAL A held on the property

and $98,837.84 was deposited into INDIVIDUAL A's account. The balance went to pay closing and other miscellaneous costs associated with the sale.

### INDIVIDUAL A Checks for BILLS' Expenses and Loans

74.     Investigation to date has identified two people who loaned money to BILLS via check, and then BILLS repaid the loans using a check from INDIVIDUAL A. Neither of these individuals knows INDIVIDUAL A or has had any financial dealings with INDIVIDUAL A. On one of these INDIVIDUAL A checks, the memo line appears to read, "painting of equipment." The payee on the check confirmed that this memo was inaccurate and he/she is in no way involved in that line of work. In total, BILLS paid these individuals approximately $15,500 in INDIVIDUAL A checks from 2008 to 2010.

75.     In 2008, BILLS also paid a catering service for a personal party at BILLS' home with a $2,400 check from INDIVIDUAL A. The owner of the catering service has confirmed that he/she does not know INDIVIDUAL A nor did he/she have any financial dealings with INDIVIDUAL A.

76.     When BILLS retired from the City of Chicago, he had a retirement party at a hotel in Chicago on June 30, 2011. Records reflect that the majority of the deposit for the party was made with a $1,500 check from

INDIVIDUAL A and $3,000 in cash. INDIVIDUAL A also wrote a check for $300 to fund the party.

### INDIVIDUAL A's Cash Withdrawals

77.     From 2006 to 2011, INDIVIDUAL A withdrew over $643,000 in cash. Most of these withdrawals were in large whole thousand dollar amounts. The majority of these cash withdrawals occurred within days of one of the following: (a) cash deposits by BILLS and/or his wife; (b) travel expenses paid in cash by BILLS; (c) BILLS' purchase of a Mercedes in cash; (d) BILLS' repayment of certain loans in cash; as well as (e) emails setting up meetings between BILLS and INDIVIDUAL A.

### BILLS' Cash Deposits

78.     From October of 2005 until August of 2011, BILLS and his wife deposited approximately $103,000 in cash into various bank accounts. Approximately 39 of these deposits, totaling approximately $47,500, were made within days of INDIVIDUAL A withdrawing cash from his account. Additionally, the majority of the cash deposits, including those that were not made within days of INDIVIDUAL A withdrawing cash from his account, were not supported by a previous cash withdrawal by BILLS.

### BILLS' Travel Expenses

79.     Records reflect at least 35 trips taken by Bills between 2006 and 2011. This includes trips to Arizona, Super Bowl trips, golf outings with friends, etc. While certain portions of some of these trips were paid for by Redflex, as outlined above, the majority of the travel expenses (airline, hotel, car, meals, etc.) were not. A review of BILLS' credit card records shows very little credit card activity around the time of the travel. In my experience, lack of use of credit cards around the time of travel would indicate that BILLS most likely used cash to pay for expenses associated with his travel.

## BILLS' Cash Purchase of Mercedes Benz

80.     On June 19, 2009 and June 20, 2009, INDIVIDUAL A withdrew $7,000 and $3,500, respectively, from his bank account. On June 22, 2009, BILLS purchased a used Mercedes-Benz for $12,500 using cash after responding to an advertisement placed on the Internet.

## BILLS' Repayment to Individuals Using Cash

81.     Investigation to date has identified three people who, at BILLS' request, charged personal expenses of BILLS on their credit cards. BILLS then repaid these individuals back in cash. In total, BILLS paid these individuals approximately $8,800 in cash from 2008 to 2011.

82.     Investigation to date has identified two people who loaned money to BILLS via check, and then BILLS repaid the loan in cash. These individuals have said that BILLS sometimes paid them cash at the same

time that he/she gave BILLS a check. In total, Bills paid these individuals approximately $14,300 in cash from 2007 to 2011.

## Cash Withdrawals In Relation to Meetings

83.    A comparison of INDIVIDUAL A's bank records to email accounts for BILLS and INDIVIDUAL A reflect that from 2008 through 2011, on approximately 12 occasions, INDIVIDUAL A withdrew large sums of money from his checking account within a business day of INDIVIDUAL A and BILLS arranging over email to meet in person.

## Other Large Cash Payments by BILLS

84.    A review of BILLS' financial records from 2005 to 2012 reflects minimal cash withdrawals. Investigation to date has identified the following large cash payments made by BILLS and/or his wife:

    a.    2005 boat purchase ($10,000)
    b.    2006 addition to cabin in Michigan ($6,000-$8,000)
    c.    2007 boat storage ($1,200)
    d.    2009 car purchase ($12,500)
    e.    04/08-04/12 rent payments ($28,280)
    f.    2007-09 money orders to pay BILLS' girlfriend's mortgage ($16,000)
    g.    2008-09 money orders to pay BILLS' home mortgage ($5,500)
    h.    2007-12 cash/money orders to BILLS' children's parochial schools ($3,100)
    i.    2011-12 to divorce attorney ($1,200)

## **Conclusion**

85.    Based on the foregoing facts, I submit that there is probable cause to believe that, from no later than late 2002 to no earlier than June 2011, JOHN BILLS, being an agent of the City of Chicago, a local government that received in excess of $10,000 in federal funding in each twelve-month period from 2002 through 2011, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept things of value, namely, cash payments and other personal financial benefits, intending to be influenced and rewarded in connection with any business, transaction, and series of transactions of $5,000 or more, of the City of Chicago, namely contracts for the Digital Automated Red Light Enforcement Program, in violation of Title 18, United States Code, Section 666(a)(1)(B).

FURTHER AFFIANT SAYETH NOT.

BRIAN J. ETCHELL
Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me
this 13 day of May 2014

Hon. Maria Valdez
United States Magistrate Judge

28