IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | No. 14 CR 135 |
| ) | |
| JOHN BILLS, ) | Judge Virginia M. Kendall |
| ) | |
| Defendant. ) | |

# **MEMORANDUM OPINION AND ORDER**

The Government charged Defendant John Bills, the former Managing Deputy Commissioner for the City of Chicago's Department of Transportation, with fraud in connection with a scheme involving accepting bribes in exchange for steering the Chicago Red Light Camera Program towards contracting with Redflex Traffic Systems, a vendor of the camera systems. Specifically, the Indictment charges Bills with twenty counts in total, including mail fraud in violation of 18 U.S.C. § 1341 (Counts I-IX); wire fraud in violation of 18 U.S.C. § 1343 (Counts X-XII); extortion in violation of 18 U.S.C. § 1951(a) (Count XIII); conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (Count XIV); solicitation and acceptance of bribes concerning a program that receives federal funds in violation of 18 U.S.C. § 666(a)(1)(B) (Counts XV-XVII); and submitting fraudulent tax returns in violation of 26 U.S.C. § 7206(1) (Counts XXI-XXIII). *See* Dkt. No. 20. Bills now moves for a change of trial venue pursuant to Fed. R. Crim. P. 21(a) (Dkt. No. 66), arguing that the coverage in the Chicago news media about his prosecution, and the red light camera program in general, has been so

pervasive and negative that an impartial jury cannot be empaneled. For the reasons discussed below, the Court denies Bills's motion.

## BACKGROUND

The events leading up to this case stem from the City of Chicago's contract with Redflex Traffic Systems for the installation, maintenance, and operation of Chicago's first red light camera program in October 2003. Defendant John Bills worked for Chicago from June 1979 until he retired in June 2011. Relevant to the instant proceedings, Bills was the Managing Deputy Commissioner of Chicago's Department of Transportation. In this position, Bills managed Chicago's red light camera program since its initiation in late 2002 until his retirement in 2011. Redflex developed and manufactured digital photo traffic enforcement systems, including red light cameras. The other defendants in the case, Martin O'Malley and Karen Finley, worked for Redflex.

In October 2003, Chicago and Redflex entered into a contract for the installation and operation of the red light cameras. The Government alleges that Chicago awarded Redflex the contract at Bills's instruction after he received bribes and personal financial benefits from Redflex. In 2012, the Chicago Tribune began reporting on the relationship between Bills and Redflex in connection with the red light camera contract. The Government indicted Bills on August 13, 2014, charging him with twenty counts. Bills now moves for a change of venue for his trial, arguing that the pretrial publicity and media coverage in this case makes it impossible for him to receive a fair trial in the Northern District of Illinois.

## DISCUSSION

Although the Constitution provides that trials should occur in the "district wherein the crime shall have been committed," U.S. Const. amend. VI, the Federal Rules of Criminal

Procedure create an exception when pretrial prejudice warrants a change of venue. "Upon the defendant's motion, the court must transfer the proceeding against the defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). A transfer is warranted if "extraordinary local prejudice will prevent a fair trial— a 'basic requirement of due process.' " *Skilling v. United States*, 561 U.S. 358, 378 (2010) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). The Court maintains discretion to grant or deny a change of venue motion. *See United States v. Philpot*, 733 F.3d 734, 740 (7th Cir. 2013) (courts of appeals review decisions concerning a change of venue for abuse of discretion, which means that the facts must "compel—and not merely support—a finding that a change in venue is necessary") (citation omitted)).

Seeking transfer of venue to the United States District Court for the District of Nevada, Bills argues that pretrial publicity has tainted the jury pool in the Northern District of Illinois so tremendously that a change of venue is the only way to preserve his right to fair trial under the Fifth and Sixth Amendments to the United States Constitution. "Extensive pretrial publicity does not, in itself, render a trial unfair and violate a defendant's right to due process." *Willard v. Pearson*, 823 F.2d 1141, 1146 (7th Cir. 1987). Nor does juror impartiality require ignorance of the circumstances surrounding the charged activity. *See Skilling*, 561 U.S. at 380 ("Prominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*."); *see also Irwin v. Dowd*, 366 U.S. 717, 722 (1961) (jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case."). Instead, "[p]rejudice can be established by either a showing of actual prejudice, for example, when jurors can be shown to

3

have exposure to pretrial publicity that prevents them from judging the case impartially, or by presumed prejudice, which occurs in cases surrounded by a carnival atmosphere, where pervasive and inflammatory pretrial publicity makes juror bias inevitable." *United States v. Nettles*, 476 F.3d 508, 513 (7th Cir. 2007) (citation and quotation marks omitted).

Bills argues that because he is "accused of being a central player in a transaction that helped bring about one of the most unpopular regulatory programs" in Chicago's history, he cannot receive a fair trial in Illinois. Bills contends that the nature of the pretrial publicity and community response surrounding the red light camera program has been "pervasive, relentless, and fierce" since 2012. The Court disagrees and finds that this is not an "extreme case" in which a presumption of prejudice arises. *See Skilling*, 561 U.S. at 381. Courts apply a number of factors when determining whether pretrial publicity and media coverage has so infected a jurisdiction's jury pool that a change of venue is warranted. These include the size and characteristics of the community where the crime occurred, the nature of the news stories, and the time that elapsed between heavy news coverage and the trial.[1] *See Skilling*, 561 U.S. at 382-384; *Philpot*, 733 F.3d at 741. Here, none of these factors lead the Court to believe that Bills will be unable to receive a fair trial in the Northern District of Illinois or that juror voir dire cannot address every concern that Bills raises. Because Bills's motion fails to demonstrate "the kind of circus atmosphere required for presumed prejudice," *Philpot*, 733 F.3d at 741, the Court denies his motion for a change of venue.

### A. Size of Community

The Supreme Court has emphasized that "the size and characteristics of the community in which the crime occurred" plays an integral role when determining the risk of presumed prejudice stemming from pretrial publicity. *Skilling*, 561 U.S. at 382. Here, the sheer size of the

---

[1] A fourth factor, whether the jury acquitted on any counts, is not relevant at this stage. *See Skilling*, 561 U.S. at 383.

Eastern Division of the Northern District of Illinois weighs heavily against a finding of presumed prejudice based on pretrial publicity. Bills acknowledges that the Eastern Division of this District comprises over eight million people. This division includes Chicago, one of the largest and most diverse cities in the country, but it also contains smaller cities and municipalities as well as suburban and rural communities. "Given this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain." *Id.* (Houston's population of 4.5 million made it nearly impossible to assert presumed prejudice); *see also In re Tsarnaev*, 780 F.3d 14, 21 (1st Cir. 2015) (arguing that an impartial jury could not be selected stretched the imagination when considering the Eastern Division of the District of Massachusetts' population of about five million people); *Philpot*, 733 F.3d at 741 (Northwest Indiana's population of roughly 600,000 people weighed against concluding that defendant could not receive a fair trial in the Northern District of Indiana).

Because the Eastern Division of this District is extremely vast, diverse, and bustling, any potential for prejudice emanating from pretrial publicity is thoroughly mitigated. *See Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (potential for prejudice mitigated by the size of the "metropolitan Washington [D.C] statistical area, which has a population of over 3 million, and in which, unfortunately, hundreds of murders are committed each year"); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991) (plurality opinion) (lessened likelihood of prejudice where jurors were selected from a pool of over 600,000 individuals). Here, Bills's trial is just "one story among many" and will take place in a jurisdiction where, unfortunately, allegations of political corruption are not uncommon. *See Willard*, 823 at 1147 (7th Cir. 1987) (recognizing that a fair trial for the defendant may be more likely "in a metropolitan area like Indianapolis, where his case was just one story among many"). Moreover, Bills has not shown that the pretrial publicity

in this case has been any more severe than in other local political corruption cases successfully tried in this division of this District in recent years.[2] Although Bills argues that he is subject to negative publicity primarily because of his notoriety in the community as a longtime public official and his connection to Mike Madigan, the Speaker of the Illinois House of Representatives, "[i]t is hardly surprising or unusual that a federal indictment of an elected official, especially one with so many years of service, would draw the attention of the press or evoke comments from the public." *See, e.g.*, *United States v. Philpot*, No. 2:11-CR-133-JTM-PRC, 2012 WL 2064620, at *6 (N.D. Ind. June 7, 2012). Based on the size and diversity of this division of the District, the media coverage in this case has not risen to the level such that Bills cannot receive a fair trial.

### B. Nature of News Stories

Bills submitted a number of newspaper articles and a list of other articles in an attempt to demonstrate the depth and overall negativity of media coverage on this case. While there has been significant pretrial publicity, the atmosphere here cannot be characterized as "disruptive to the ability of the [defendant] to be adjudged by a fair and impartial jury." *Tsarnaev*, 780 F.3d at 21. A review of the submitted articles shows that only a minority actually focus on Bills, as opposed to other participants in the alleged scheme or the red light camera program itself. Although Bills argues at length that the public's general dissatisfaction with red light cameras implicitly prejudices Bills, there is a big difference between dissatisfaction with a municipal program and a premature adjudication of guilt as to an individual who happens to be associated with that program. *See Skilling*, 501 U.S. at 384 n. 17 ("when publicity is about the event, rather than directed at individual defendants, this may lessen any prejudicial impact") (quoting *United*

---

[2] Former Governor George H. Ryan, Sr. was convicted by a jury on April 17, 2006 in this District. *See United States v. Ryan*, No. 02 CR 506-4. Another jury in this District convicted former Governor Rod Blagojevich on June 27, 2011. *See United States v. Blagojevich*, No. 08 CR 888-1.

*States v. Hueftle*, 687 F.2d 1305, 1310 (10th Cir. 1982)). Besides, any potential juror's opinions on the red light camera program can be thoroughly addressed through voir dire. Not everyone in the juror pool lives in Chicago or a municipality that employs red light cameras. Not every potential juror drives a car. Not every potential juror has received a ticket through the red light camera program. These are all questions that may be asked during voir dire. Because it would strain credulity to suggest that it is impossible to find twelve people, out of a pool of over eight million individuals, that have not been so affected by the red light cameras such that they remain neutral, the Court concludes that the media coverage and general distaste toward red light cameras does not warrant a change in venue.

Moreover, of the few articles directly aimed at Bills, the majority are informative in nature, discussing the charges found in the Indictment, the alleged relationship between Bills and Redflex, and the proceedings that have occurred in this Court. *See Philpot*, 733 F.3d at 741 (no presumption of prejudice where "most of the news stories to which [the defendant] object[ed] were factual in nature"). Although a few of the articles can be characterized as critical of Bills rather than informative,[3] there is no indication here that the surroundings of the trial are so "utterly corrupted by press coverage" that Bills will be stripped of a fair trial. *Skilling*, 561 U.S. at 380. While the critical news stories about Bills have not been kind, "they contain[] no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* at 382. The fact that the March 2, 2013 Chicago Tribune article reports that Redflex "admits it likely bribed Chicago official" is not "evidence of the smoking-gun variety" that invites prejudgment of Bills's culpability. *See id.* at 283 ("A jury

---

[3] These include: (1) David Kidwell, *Red light camera firm admits it likely bribed Chicago official*, Chi. Tribune, March 2, 2013; (2) Kim Janssen, *Ex-City Hall boss took bribes in red-light program: feds*, Chi. Sun-Times, May 15, 2014; (3) David Kidwell, *Colorful past for insider at center of red light probe*, Chi. Tribune, May 17, 2014; (4) Mark Brown, *Feds say city employee was working the red light district*, Chi. Sun-Times, June 17, 2014; and (5) Editorial Board, *Chicago's red light camera system has lost credibility*, Chi. Tribune, August 14, 2014.

7

may have difficulty in disbelieving or forgetting a defendant's opinion of his own guilt but have no difficulty in rejecting the opinions of others because they may not be well-founded."). This is particularly true here, as Bills expressly disavowed "anything improper about [the] handling of the Redflex contract" in that same article. (Dkt. No. 66, Ex. 2.) This case therefore lacks the extreme level of publicity required for a showing of presumed prejudice. *Cf. Estes v. Texas*, 381 U.S. 532, 536 (1965) (televising of proceedings in a notorious criminal case resulted in setting aside the conviction despite absence of showing of prejudice); *Rideau v. State of Louisiana*, 373 U.S. 723, 724 (1963) (repeated broadcast of defendant's taped confession two months before trial in locale of 150,000 people mandated venue change).

Bills also suggests that the lack of control by the Court over the source of the negative publicity supports his request for transfer. Here, the source of the press coverage in this case is primarily news reporters and editorial writers over whom the Court exerts no control. *See Sheppard v. Maxwell*, 384 U.S. 333, 361 (1966). Nevertheless, this consideration is largely irrelevant based on the size of this division of the District and the fact that the media coverage has substantially either been factual in nature or directed at the red light camera program itself, as opposed to specifically at Bills. This is bolstered by the fact that, like in Boston and Houston, Chicago-area residents obtain their news from a vast array of sources. *See Tsarnaev*, 780 F.3d at 21. This argument therefore does not alter the Court's conclusion that Bills can receive a fair trial in this jurisdiction.

### C. Proximity of Time Between Coverage and Trial

As to the passage of time, Bills argues that the media coverage of the case has been comprehensive and has shown no signs of abating. Indeed, there is little doubt that there has been extensive publicity in this case, as is expected when a federal indictment charges an elected

official with criminal activity. But this is not a case where trial swiftly follows the underlying crime. *Cf. Rideau*, 373 U.S. at 724 (trial occurred two months after broadcast of videotaped confession). The Chicago Tribune began its heavy coverage of the case in 2012, and a review of the submitted articles shows that the Chicago Tribune and Chicago Sun-Times have only released a handful of articles specifically directed at Bills in the past year. A majority of these discuss factual events happening in this Court. Moreover, a search of "John Bills" on the Chicago Tribune's web site yields only a few articles written in 2015. So although reporters are continuously covering Bills's proceedings, "the decibel level of media attention [has] diminished somewhat" in the time following Bills's Indictment in August 2014. *Skilling*, 561 U.S. at 383; *see Tsarnaev*, 780 F.3d at 22 (the nearly two years that passed between the Boston Marathon bombings and the defendant's change of venue motion allowed community passions to diminish); *Philpot*, 733 F.3d at 741 (where most of the media coverage occurred a year before the trial, there was no "circus atmosphere required for presumed prejudice"). Here, Bills is set for trial on October 26, 2015 and the Court disagrees with Bills's contention that the media coverage "has continued with no sign of abating." Because the proceedings in this case are not marred by "pervasive and inflammatory pretrial publicity" where juror bias would be inevitable, the Court concludes that a change of venue is not warranted. *Nettles*, 476 F.3d at 513 (citation omitted).

None of the factors leading to a presumption of prejudice stemming from pretrial publicity are present in this case. Although publicity has been extensive, the size of the Eastern Division of the Northern District of Illinois, combined with the primarily factual nature of the news coverage and the timing of the heaviest coverage, leads to a conclusion that a venue change is not justified here. Moreover, Bills's concerns with the public's generic dissatisfaction with red light camera programs, both in Chicago and elsewhere, can be sufficiently addressed at voir dire.

9

The "ultimate question" posed by a change of venue motion "is whether it is possible to select a fair and impartial jury, and in most situations the voir dire examination adequately supplies the facts upon which to base that determination." *Id.* (quoting *United States v. Peters*, 791 F.2d 1270, 1296 (7th Cir. 1986) (internal citation omitted)). Such is the case here and the Court denies Bills's motion for a change of venue.

## **CONCLUSION**

For the reasons stated herein, the Court denies Bills's motion for a change of venue.

 _____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: 6/12/2015