IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | No. 14 CR 135 |
| ) | |
| JOHN BILLS ) | Judge Virginia M. Kendall |
| ) | |
| Defendant. ) | |

## **MEMORANDUM OPINION AND ORDER**

On August 13, 2014, Defendant John Bills was indicted on twenty counts[1] for fraudulently causing the City of Chicago ("City") to award Redflex Traffic Systems, Inc. ("Redflex") a contract for the installation and operation of red light cameras after he received bribes and personal benefits from Redflex. (Dkt. No. 156 at ¶ 1; Dkt. No. 164 at 1.) Following a two-week trial, a jury convicted Bills of all counts of the indictment on January 26, 2016. (Dkt. 148.) Bills moves for a judgment of acquittal under Fed. R. Crim. P. 29(c) arguing principally that the evidence presented to the jury was inherently unreliable. (*Id*. at 2-4.) Alternatively, Bills requests a new trial under Fed. R. Crim. P. 33, claiming that the Court erred by: (1) admitting hearsay testimony regarding the existence of and Bills's role in the alleged conspiracy, and (2) denying Bills's pre-trial motion to change venue. (*Id*. at 4-15.) The Court denies Bills's

---

[1] Specifically, Bills, who was the Managing Deputy Commissioner of City's Department of Transportation, was indicted of mail fraud in violation of 18 U.S.C. § 1341 (Counts I-IX); wire fraud in violation of 18 U.S.C. § 1343 (Counts X-XII); extortion in violation of 18 U.S.C. § 1951(a) (Count XIII); conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (Count XIV); solicitation and acceptance of bribes concerning a program that receives federal funds in violation of 18 U.S.C. § 666(a)(1)(B) (Counts XV-XVII); and submitting fraudulent tax returns in violation of 26 U.S.C. § 7206(1) (Counts XXI-XXIII). (*See* Dkt. No. 20; *see also* Dkt. No. 159 at 1-2.)

1

motion because there was more than sufficient evidence to support the jury's verdict and the Court's previous rulings were supported by the facts and the law.

## I. Bills is Not Entitled to a Judgment of Acquittal

Bills asserts that he is entitled to a judgment of acquittal because the evidence presented to the jury was insufficient to sustain his conviction. He principally contends that the evidence was inherently unreliable and therefore should have been disregarded by the Court. *See* Fed. R. Crim. P. 29. Bills faces "a nearly insurmountable hurdle" in claiming that the jury had insufficient evidence to conclude that he was guilty of the charges. *See e.g. United States v. Domnenko*, 763 F.3d 768, 772 (7th Cir. 2014) (citing *United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014)). Once the Defendant is convicted, the Court reviews the evidence presented to the jury in the light most favorable to the Government and makes all reasonable inferences in the Government's favor. *See United States v. Cejas*, 761 F.3d 717, 726 (7th Cir. 2014) (citing *United States v. Larkins*, 83 F.3d 162, 165 (7th Cir. 1996)). The Court may overturn the jury's guilty verdict only if upon viewing the evidence in the light most favorable to the Government, "the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013) (quoting *United States v. Stevenson*, 680 F.3d 854, 855-56 (7th Cir. 2012)). Finally, "[i]t is up to the jury to weigh the evidence and determine the credibility of the witnesses; [courts do] not second-guess the jury's assessment of the evidence." *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008).

Bills contends that the Court should grant his motion for judgment of acquittal because the Government "relied almost exclusively" on the testimony of three witnesses – Karen Finley,

Martin O'Malley[2], and Aaron Rosenberg – who were "inherently unreliable" and whose testimony "was not supported by anything other than their own statements or, arguably, documents which support their version of the events only if [the jury] believe[d] their interpretations of those documents." (Dkt. No. 159 at 3-4.) Based upon those allegations, Bills argues that the Court should have disregarded those witnesses' testimony and should now enter a judgment of acquittal.

As an initial point, the Court is obliged to "defer[] to the jury's credibility determinations" and "cannot second-guess the jury's determination of which witnesses were credible and which were not." *United States v. Graham*, 315 F.3d 777, 781 (7th Cir. 2003). Bills's current arguments that Finley and Rosenberg "are admitted liars" and that O'Malley's story was "largely unsupported" are essentially requests to this Court to "reweigh the credibility of the witnesses." *See, e.g., Myers v. Scales*, No. IP 00-0457-C-T/K, 2002 WL 31242735, at *2 (S.D. Ind. Aug. 30, 2002). "However, it is within the exclusive province of the jury to judge the facts and the credibility of the witnesses." *See, e.g., id.* at *2; *see also Goodwin v. MTD Products, Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) ("Rather, credibility questions are within the province of the trier of fact, in this case a jury.'); *Hasham v. Ca. State Bd. of Equalization*, 200 F.3d 1035, 1047 (7th Cir.2000) ("We will not second-guess a jury on credibility issues.). Given that the Court may not overtake the jury's role and reassess witness credibility, Bills's contentions are insufficient to meet the nearly insurmountable hurdle before him.

Even more, his argument that the testimony should have been disregarded "because it was not supported by anything other than their own statements" or the witnesses' interpretation of the documentation presented to the jury is simply contrary to the trial record. First, the Government presented other witnesses, all of whom had no previous relationship with Bills, that

---

[2] O'Malley and Finley were also defendants in this case.

bolstered the testimony provided by Finley, Rosenberg, and O'Malley. For example, Jack Jarzynka testified that he sold his Arizona condominium to O'Malley *through* John Bills, who delivered a check to Jarzynka to place the condominium on hold even though the eventual HUD 1 Settlement Statement listed O'Malley and his wife as the borrowers. Jarzynka testified that he never met O'Malley despite the fact that O'Malley was listed as the purchaser of the home. This evidence showed that O'Malley was sending Bills money that O'Malley received from Redflex to effectuate such purchases.

Anthony Rudis's testimony was nearly identical. Rudis stated that Bills paid him $2,400 for catering Bills's daughter's graduation party through a check that was written off the account of M.G. O'Malley & Associates. Just as with Jarzynka, Rudis did not know O'Malley, had never met O'Malley, and had never done any business with M.G. O'Malley & Associates.

Finally, Michael Noonan's testimony further bolsters the testimony of the three principal witnesses. In an identical vein to that of Jarzynka and Rudis, Noonan testified that Bills repaid Noonan for monies that Noonan lent to Bills by providing Noonan with number of separate checks that were written from the account of M.G. O'Malley & Associates. Similarly to the other two witnesses, Noonan also testified that did not know O'Malley, had never met O'Malley, and had never done business with M.G. O'Malley & Associates.

All of this evidence, corroborated and supported O'Malley's testimony that he passed along commissions and bonuses that he received from Redflex to Bills, allowing Bills to spend thousands of dollars on meals, vacations, and even another home among other purchases. The three principal witnesses' testimony was therefore corroborated and the circumstantial evidence supported Bills's involvement in the conspiracy and the substantiated the benefits that he derived from that conspiracy.

Along with the testimony of other witnesses, the Government presented further evidence in the nature of e-mails, airline and financial records, and other documentation that corroborated the testimony of the three main witnesses. For example, Rosenburg testified that he submitted numerous expense requests – related to hotel stays, meals, and other gifts – to Redflex on behalf of John Bills. The jury had the opportunity to review a number of those expense requests through the multitude of cash expense statements that the Government submitted as part of its presentation of evidence. (*See, e.g.,* Government Trial Exhibit[3] 272.) In all, Rosenberg submitted expense requests amounting to some $14,246.17; a number that Rosenburg testified to and the documentary evidence unequivocally supported. (*See* Govt. Tr. Ex. 287.) Moreover, the Government introduced recorded conversations between Rosenburg and Bills in which the two clearly discussed airline flights and other benefits for the latter that were expensed to Redflex. (*See* Govt. Tr. Ex. 318.) The Government presented a similar chart of expenses that O'Malley submitted on Bills's behalf between January 2003 and June 2011. (Govt. Tr. Ex. 280.) The jury further heard testimony and reviewed documentary evidence of a number of other benefits that Bills received from Redflex through O'Malley. For instance, the jury heard about and saw a copy of the fax by which O'Malley transferred his Val Vista membership to Bills for the Beach Club Village in Arizona within weeks of the date on which Bills purchased the condominium using documents that listed O'Malley and his wife as borrowers. (Govt. Tr. Ex. 202.)

Given that this evidence is merely a very small proportion of the substantial amount of evidence that the Government placed before the jury, and taking all reasonable inferences in the favor of the Government, it was reasonable that the jury found Rosenberg, O'Malley, and

---

[3] The Court will refer to the Government's Trial Exhibits as "Govt. Tr. Ex." for the remainder of the Order.

Finley's testimony regarding Bills's culpability both reliable and persuasive.[4] Accordingly, the Court denies Bills's motion for a judgment of acquittal.

## II. The Court Did Not Err Such that a New Trial is Necessary

Rule 33(a) of the Federal Rules of Criminal Procedure states that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." *See also United States v. Berg*, 714 F.3d 490, 500 (7th Cir. 2013); *United States v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012). "A defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006); *see also United States v. Eberhart*, 388 F.3d 1043, 1048 (7th Cir. 2004) ("'[C]ourts have interpreted [Rule 33] to require a new trial in the interests of justice in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial.'") (quoting *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989))), *overruled on other grounds*, 546 U.S. 12 (2005). However, "[a] jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (citations omitted). Bills presents two arguments in support of his motion for a new trial, but neither has merit.

### A. Admission of Hearsay Testimony

Bills first argues that the Court erred by admitting hearsay statements as co-conspirator statements under Fed R. of Evid. 801(d)(2)(E) ("Santiago Proffer").[5] (Dkt. No. 159 at 9-17.)

---

[4] As a last ditch contention, Bills makes the rather incredible argument that O'Malley's testimony in particular is unreliable as his "story was largely unsupported by anything other than his self-serving statements." (Dkt. No. 159 at 3.) However, Bills's failure to identify any specific statements – or even a category of statements – that he alleges are self-serving belies his contention, particularly as O'Malley, throughout his testimony, admits to participating in the conspiracy by sending Bills money and other benefits from Redflex, incriminating himself in the process.

[5] The Court, after reviewing the Government's Proffer and briefing by both parties, admitted the evidence in the Proffer at the parties' Final Pre-trial Conference on December 22, 2015, stating: "The Court additionally grants the

"For a co-conspirator's statements to be admissible under FRE 801(d)(2)(E), the government must establish by a preponderance of the evidence (1) that a conspiracy existed, (2) that the defendant and the declarant were members of the conspiracy, and (3) that the statements were made in furtherance of the conspiracy." *United States v. Pust*, 798 F.3d 597, 602 (7th Cir. 2015) (citing *United States v. Villasenor*, 664 F.3d 673, 681–82 (7th Cir. 2011)). Bills contends that the Government failed to set forth sufficient evidence for each of the three prongs to meet the preponderance standard.

1. Evidence that a Conspiracy Existed

To prove that a conspiracy existed, "the Government [must] establish the existence of an agreement between two or more persons 'for the purpose of committing, by their joint efforts, a criminal act.'" *United States v. Hunte*, 196 F.3d 687, 691 (7th Cir. 1999) (quoting *United States v. Campbell*, 985 F.2d 341, 344 (7th Cir. 1993)). "In order to sustain a conspiracy conviction, the Government must present substantial evidence that a conspiracy existed and the defendant agreed to join it." *United States v. Katalinich*, 113 F.3d 1475, 1480 (7th Cir. 1997). The Government may rely on either direct or circumstantial evidence in showing that a conspiracy existed. *See United States v. Johnson*, 592 F.3d 749, 754-55 (7th Cir. 2010) ("And ordinarily, the government may prove a conspiracy on circumstantial evidence alone.").

. There was significant evidence supporting the existence of the conspiracy. First, the evidence clearly illustrated (and the jury found) that Bills and others, principally Redflex executives and employees, entered into a conspiracy to deprive the City of honest services. The evidence first showed that Bills received sample RFPs and sample ordinances in 2002 from Rosenberg. That evidence was substantiated not only by Rosenberg himself, but also by Don Grabowski who

---

Government's motion to conditionally admit evidence through its Santiago proffer. (Dkt. No. 94.) The proffer is sufficiently detailed and, as alleged, properly states the existence of a conspiracy." (Dkt. No. 116 at 1.)

testified to the same. Once that relationship was established, Bills began to receive impermissible benefits almost immediately from Redflex via Rosenberg during the time that Redflex's contract proposal was pending. The evidence adduced at trial then showed that once Redflex won the red-light camera contract, it began to expand its relationship with Bills, providing him with even more benefits in exchange for his continued support. Among the most damning evidence of the existence of a conspiracy was the fact that Redflex hired O'Malley, at the direction of Bills, to be its customer service representative despite the fact that O'Malley was not qualified for that position in the least. The hiring decision, according to Finley's testimony, came directly from Bruce Higgins, Redflex's CEO, who told her that O'Malley was Bills's candidate and therefore would be hired. O'Malley's hiring also coincided with Redflex finalizing its contract with the City: a contract that included a liquidated damages cap that was both supported by Bills and against the City's interests according to its own attorney, Art Dolinsky. The evidence further indicated that O'Malley "negotiated" his contract with Redflex with direct guidance from Bills, only further bolstering the circumstantial evidence that Bills, Redflex employees, and others were all involved in a scheme through which Redflex would defraud the City and compensate Bills for his participation in the conspiracy.

Moreover, the Government set forth substantial evidence to show how Bills received significant benefits for his involvement in the scheme, which in turn provides even more support for the existence of the scheme. As discussed above, Bills received monies and a number of other benefits – including trips, meals, rental cards, and a condominium in Arizona – from RedFlex through the other participants in the scheme. Along with the previously discussed examples, O'Malley testified to – and documentary evidence substantiated – the existence of a coded language between him and Bills through which the latter requested money from O'Malley

8

– money that, again, originated from Redflex. As one example of this coded language being employed, O'Malley testified that when Bills invited him out to lunch by stating "[a]n eight-page speed overview can be discussed at lunch if your schedule permits," Bills was speaking in code and wanted O'Malley to give him eight thousand dollars. (*See* Govt. Tr. Ex. 184 (emails from Bills using coded language).) Even more damning was the fact that evidence showed that O'Malley then withdrew $8,700 over the next two days to give to Bills. As such, based on the substantial circumstantial evidence that the Government presented to the jury and to the Court, the Government presented more than enough evidence to show that a conspiracy existed.

Despite the multitude of both testimony and documentary evidence presented on the issue, Bills nevertheless sets forth a single contention based on juror Michael Woerner's interview with the Chicago Tribune. *See* David Kidwell, *Ex-City Official Guilty in Redflex Bribe Case*, Chicago Tribune, Jan. 27, 2016, at A-1, A-8. Specifically, Bills cites to Woerner's statements that the jury "wished there was a smoking gun, a picture of someone handing [Bills] cash, and there wasn't" and that the jury did not like that the prosecutors relied "so heavily on three witnesses who had won deals," in support of his position that the Government did not show by a preponderance of the evidence that a conspiracy existed. *Id*. Bills's contention suffers from a number of fatal flaws. First and foremost, Fed. R. Evid. 606(b) expressly prohibits Bills's attempt to use Woerner's assessment of the jury's determinative process as grounds for a new trial. "Rule 606(b) 'is designed not only to protect the jurors from being pestered by lawyers after verdicts are rendered, but also to protect the judicial process from efforts to undermine verdicts by scrutinizing the jurors' thoughts and deliberations. Thus, a court will not inquire into the jury's deliberative process, including arguments, statements, discussions, mental and emotional reactions, and votes, in the absence of a claim of external influence.'" *See, e.g.,*

9

*United States v. Spano*, No. 01 CR 348, 2002 WL 31681488, at *2 (N.D. Ill. Nov. 27, 2002) (quoting *United States v. Ford*, 840 F.2d 460, 465 (7th Cir. 1988)). "The Rule 'also prevents individual jurors from manipulating the system by later repudiating the verdict when their views were in the minority.'" *See, e.g., id.* (quoting *United States v. Allen*, 736 F.Supp. 914, 918 (N.D. Ill. 1990)). Here, Bills does not allege that there was any external influence on the jury, and therefore the Court is barred from inquiring into the jury's deliberative process, particularly given that the rule was designed to ensure that an individual juror could not undermine the verdict by later casting doubt upon it.

Second, even if the Court was able to consider Bills's contention, Bills mischaracterizes the juror's statements. As the Government outlines in its Response, a *complete* review of the juror's statements clearly indicates that the jury was convinced by the other presented evidence: "Jurors didn't like that prosecutors relied so heavily on three key witnesses who had won deals, Woerner said, but emails, bank records and other witnesses buttressed their testimony," and "[y]ou wished there was a smoking gun, a picture of someone handing him the cash, and there wasn't, Woerner said. But it was so close to that." (Kidwell, *supra*, at A-1, A-8 (emphasis added and internal quotation marks omitted); *see also* David Kidwell and Jason Meisner, *Ex-City official convicted on 20 counts in red light cameras trial*, Chicago Tribune, Jan. 28, 2016 (different article including the same quotations).) As such, even if the Court were to disregard the plethora of other evidence outlined above and consider Woerner's statements in a vacuum, when viewing the *complete* statements, it is clear that the Government certainly met its standard. As such, the Court rejects Bills's contentions as to the first prong of the conspiracy analysis.

2. Bills's membership in the conspiracy

Bills next contends that the Government failed to show by a preponderance of the evidence that Bills was a member of the conspiracy both in its Santiago Proffer and during trial and therefore the co-conspirator statements should have been excluded as inadmissible hearsay. (Dkt. No. 159 at 12-14.) "In order to prove a conspiracy charge, the government must show both that a conspiracy existed and that the defendant knowingly agreed to join it." *United States v. Pagan*, 196 F.3d 884, 889 (7th Cir. 1999). To meet this requirement, the Government must show that Bills participated in the alleged conspiracy, though his "mere knowledge of, approval of, association with, or presence at a conspiracy is insufficient to establish the participation element." *United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir. 1990). "In meeting its burden of proof, the government may use circumstantial evidence and, in fact, such evidence may be the sole support for a conviction." *Id.* (internal quotations omitted). However, "[o]nce the government proves the existence of a conspiracy, the government need only offer 'slight evidence' to prove that an individual was a member of the conspiracy." *United States v. Van Daal Wyk*, 840 F.2d 494, 498 (7th Cir. 1988) (quoting *United States v. Castillo*, 814 F.2d 351, 353 (7th Cir. 1987)).

Bills first contends that the Government "only succeeded via the Santiago Proffer in demonstrating a pervasive conspiracy within the ranks of Redflex" and did not show that Bills took part in that conspiracy. (Dkt. No. 159 at 13.) However, the evidence that the Government set forth in its proffer not only indicated that Bills had knowledge of the conspiracy, but was an active participant in it. The Government's Proffer is rife with evidence showing that Bills began to elicit benefits from Redflex very early on during the RFP process, and how, in return for those benefits, he worked with both Rosenberg and Higgins to "develop and codify elaborate, accurate and articulated responses" that would exemplify Redflex's strengths and exploit the other

11

applicant companies' weaknesses. (Dkt. No. 94 at 21.) Later in the process, the proffer documented how Bills and Rosenberg discussed both how much money Bills wanted to get paid along with two separate ways that Redflex could pay Bills for his services and support. (*Id*. at 24.) Such evidence of Bills's involvement in all aspects of the RFP process, the contract negotiation between Redflex and the City, *see id*. at 25, and his continued involvement with Redflex through O'Malley for many years afterwards, *see, id*. at 25-30, among a multitude of other evidence in the 61-page Proffer clearly indicated that Bills was aware of the conspiracy and participated in it. The Government provided significantly more than the required "slight evidence" of Bills's participation, and therefore, the Court denies Bills's contention in relation to the Government's Santiago proffer.

Bills also argues that the Government failed to produce sufficient evidence at trial to show that he participated in the conspiracy. However, his principal argument, that "[t]he only evidence at trial that established Bills's membership in a conspiracy was the testimony of coconspirators," is contrary to the record. (Dkt. No. 159 at 8.) As discussed above, the Government presented other evidence aside from testimony from Bills's co-conspirators, including testimony from other witnesses and a significant amount of documentary and physical evidence. Perhaps recognizing the formidable amount of evidence that the Government brought before the jury, Bills then contends that the "other evidence [including] emails, flight itineraries, [and] spending records," are not within themselves meaningful as the significance of the evidence "is based on the interpretation of the coconspirators." (*Id*.) As an initial point, Bills does not provide a single, specific example of a piece of evidence that is rendered meaningless without such interpretation. Even if such evidence does exist, the Government presented both a significant amount of non-hearsay testimony from Bills's co-conspirators and documentary

12

evidence that requires no such interpretation. (*See* Dkt. No. 167 at 8-10.) Moreover, in taking this position, Bills seems to be requesting that this Court reassess the co-conspirators' credibility, disregard their testimony after finding them unreliable, and then similarly ignore the evidence that allegedly only has value due to their testimony. As discussed above, Bills's contention is unavailing as the Court may not substitute its own credibility determinations in the place of the jury's. *See Oberman v. Dun & Bradstreet, Inc.*, 507 F.2d 349, 353 (7th Cir. 1974).

3. Statements made "in furtherance" of the conspiracy

As for the third prong, Bills contends that the Court erred in admitting the co-conspirator's statements as the Government failed to show that the statements were made "during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). "A co-conspirator statement satisfies the 'in furtherance' requirement when the statement is 'part of the information flow between conspirators intended to help each perform a role.'" *United States v. Johnson*, 927 F.2d 999, 1002 (7th Cir. 1991) (quoting *Garlington v. O'Leary*, 879 F.2d 277, 283 (7th Cir.1989)). In determining whether a statement was made "in furtherance" of the conspiracy, the Court looks to whether there was a "reasonable basis" for the jury to find that the statement furthered the conspiracy. *Id*. While the limitation is "meant to be taken seriously," *see Garlington*, 879 F.2d at 283, the Government's burden of proof is a "relatively low" one. *United States v. Shoffner*, 826 F.2d 619, 628 (7th Cir. 1987).

As with many of his other allegations, Bills fails to provide a single supporting example of a statement that was admitted at trial and did not further the conspiracy, undermining the strength of his contention. (Dkt. No. 159 at 9-10; *see also* Dkt. No. 167 at 11.) While it would certainly be within the Court's discretion to deny Bills's argument on this ground alone, a review of the trial record plainly indicates that the statements that were admitted during trial were made

13

in the furtherance of the conspiracy. Along with the statements and documentary evidence described above, the Court admitted a multitude of emails that were sent in between Redflex employees and Bills that furthered the conspiracy.

For example, Finley testified regarding an email exchange in which she, Rosenberg, and Higgins were all discussing issues that Bills identified with the Redflex website in advance of the City's evaluation committee reviewing the prospective vendors' systems. (*See* Govt. Tr. Ex. 4 (Rosenberg writing that: "Additionally, John [Bills] is having to (sic) Evaluation review each vendors system most of the day on Tuesday, it is very, very, very important that everything is running smoothly…[the website] needs to run smoothly…").) Finley further testified that Bills telling Rosenberg both what was being reviewed and when advantaged Redflex in the contract application process, and therefore was certainly in furtherance of the conspiracy. After Redflex won the contract, Bills continued to provide guidance to the company's employees about not only the original contract between Redflex and the City, but also regarding contract renegotiation and expansion. (*See* Govt. Tr. Ex. 57 (letter from Finley to Bills outlining Redflex's position on expanding the contract and requesting his input); Govt. Tr. Ex. 105 (Redflex employee William Braden emailing other employees, including Finley, that Bills approved of the letter: "For what it's worth John thought the letter was good, he was happy with the final draft.")). Such testimony and admitted exhibits are not "idle chatter" as Bills contends, but rather relate directly to Bills's personal involvement in the conspiracy and further show how he took actions in furtherance of the conspiracy.

    4.    Confrontation Clause

Bills then argues that his rights under the Confrontation Clause were violated because the Court permitted the Government to introduce statements made by co-conspirator Bruce Higgins

even though Higgins did not testify at trial. (Dkt. No. 159 at 10-11.) "The Confrontation Clause limits the use at trial of out-of-court statements that are testimonial, but the right of confrontation is not implicated by nontestimonial statements." *United States v. Jones*, 314 F. App'x 883, 886 (7th Cir. 2009) (citing *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)). Statements by co-conspirators are considered to be party admissions and not hearsay. *See United States v. Hargrove*, 508 F.3d 445, 449 (7th Cir. 2007) ("Under Rule 801(d)(2)(E) the statements of coconspirators made "during the course and in furtherance of the conspiracy" are considered admissions by a party opponent and are not hearsay. The use of this sort of evidence does not implicate the Confrontation Clause."). Moreover, "[t]he government can use statements of a coconspirator against a defendant if it proves by a preponderance of the evidence that the two were in a conspiracy and that the statements were made during and in furtherance of the conspiracy." *Jones*, 314 F. App'x at 886. Here, Higgins's statements are not hearsay as he was a co-conspirator and, as discussed at length above, the Government has met its burden to show that Higgins and Bills were involved in a conspiracy and made statements to further the conspiracy. As such, the Court denies Bills's motion for a new trial for this ground.

**B.     Change of Venue**

Bills's final argument is that the Court must grant him a new trial because it erred in denying his motion for change of venue. (Dkt. No. 159 at 17-19.) Fed. R. Crim. P. 21(a) provides that: "[u]pon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." *Id*. A transfer is warranted if "extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process.'" *Skilling v. United States*, 561 U.S. 358, 378 (2010) (quoting *In re*

*Murchison*, 349 U.S. 133, 136 (1955)). "Prejudice can be established by either a showing of actual prejudice, for example, when jurors can be shown to have exposure to pretrial publicity that prevents them from judging the case impartially, or by presumed prejudice, which occurs in cases surrounded by a 'carnival atmosphere,' where 'pervasive and inflammatory pretrial publicity' makes juror bias inevitable."[6] *Nettles*, 476 F.3d at 513 (quoting *United States v. Peters*, 791 F.2d 1270, 1296 (7th Cir. 1986) (superseded on other grounds)). In assessing whether to transfer venue, courts consider a number of factors including "the size and characteristics of the community where the crime occurred, the nature of the news stories [about the case], [] the time that elapsed between the news coverage and the trial" and whether the jury acquitted the Defendant of any counts. *United States v. Philpot*, 733 F.3d 734, 741 (7th Cir. 2013); *Skilling*, 561 U.S. at 384.

This Court denied Bills's pre-trial motion for change of venue, finding that all three of the pre-trial factors weighed against Bills's request. (*See* Dkt. No. 77 at 4-10 (finding that (1) the large size and diversity of the community, *i.e.* the Northern District of Illinois, mitigated "any potential for prejudice emanating from pretrial publicity," (2) the nature of the news stories were generally focused on the facts of the case and not on Bills and, in any event, the stories did not create an "utterly corrupted" atmosphere, and (3) the lack of proximity between the media attention and trial undermined any argument of prejudice during trial).) Here, Bills does not explicitly challenge each aspect of the Court's previous ruling, but only argues that "the pretrial publicity situation changed from the June 12, 2015 issuance of this Court's decision and the January 11, 2016 start of the trial." (Dkt. No. 159 at 18.) In support of his position, Bills refers

---

[6] Here, Bills does not make any allegations of actual prejudice "as he does not identify *anything in the record* that would indicate any given juror had been exposed to pretrial publicity." *United States v. Nettles*, 476 F.3d 508, 513 (7th Cir. 2007) (emphasis added). As such, the Court reviews Bills's arguments under the presumed prejudice standard.

16

to "three separate stories [that were published in the Chicago Tribune] between the denial of Bills' Motion for a Change of Venue [and the] empaneling of the jury." (*Id*.) Based on these three articles, including one in particular that Bills contends provides "an excellent representation of how media outlets covered" him prior to the trial, Bills seeks a new trial on the grounds that the Court erred in denying his pre-trial motion.

The Court addressed these exact concerns in its previous Order, noting that "[a]lthough a few of the articles can be characterized as critical of Bills rather than informative, there is no indication here that the surroundings of the trial are so 'utterly corrupted by press coverage' that Bills will be stripped of a fair trial." (Dkt. No. 77 at 7 (quoting *Skilling*, 561 U.S. at 380) (internal footnote omitted).) While it is true that additional articles were written in between the Court's ruling and the beginning of trial, even when taking those articles into account, the atmosphere of the trial could not have been "characterized as disruptive to the ability of [Bills] to be adjudged by a fair and impartial jury" and certainly was not akin to a "carnival atmosphere." *In re Tsarnaev*, 780 F.3d 14, 21 (1st Cir. 2015); *Nettles*, 476 F.3d at 513. The majority of the articles written in the interim period were, similarly to the articles that were published prior to the Court's previous ruling, factual in nature and did not seek to create – nor did they actually create – a sensationalized atmosphere around the proceeding. This stands in stark contrast to other cases where the extreme level of publicity, in addition to the confluence of other factors not present here, led to a finding of presumed prejudice. *Cf. Estes v. Texas*, 381 U.S. 532, 536 (1965) (televising of proceedings in a notorious criminal case resulted in setting aside the conviction despite absence of showing of prejudice); *Rideau v. State of Louisiana*, 373 U.S. 723, 724 (1963) (repeated broadcast of defendant's taped confession two months before trial in locale of 150,000 people mandated venue change).

Most importantly, the defense had ample opportunity to question jurors regarding their exposure to any news articles or press during the voir dire process. The Court has broad discretion in deciding how voir dire proceeds, including deciding which (if any) questions proposed by the parties may be asked to the jury. *See United States v. Torres*, 191 F.3d 799, 809 (7th Cir. 1999) (citing *Aldridge v. United States*, 283 U.S. 308, 310 (1931)). Unlike other cases where a trial court declined parties' requests to ask additional questions, not only did the Court question every prospective jury regarding whether they had read or heard about the case in the press, the Court also permitted the defense to ask follow up questions on the issue, despite the fact that there is no constitutional right for counsel to question jurors during voir dire. *Id*., 191 F.3d at 809. The defense made full use of those opportunities, questioning prospective jurors on a host of issues including whether they had prior knowledge of and strong feelings about the red light camera program or Bills himself. After the Court's initial questioning in open court, the Court gave defense counsel an opportunity to bring any juror to sidebar where he could then thoroughly explore any biases or prejudices that a prospective juror might have, especially regarding that prospective juror's exposure to press coverage. Many jurors were questioned in detail at sidebar by defense counsel, and this sidebar questioning was not limited in any way by the Court. Finally, a review of the questions that the Court posed to each prospective juror, not to mention the follow up questions presented by the defense, indicates that the voir dire process was detailed and thorough such that "the court made sufficient inquiry as to the background and attitudes of the jurors to enable the litigants, not only to challenge for cause, but to exercise their peremptory challenges." *United States v. Price*, 888 F.2d 1206, 1211 (7th Cir. 1989); *see also United States v. Banks*, 687 F.2d 967, 974 (7th Cir. 1982).

As such, the Court denies Bills's motion for a new trial on this ground.

## CONCLUSION

For the reasons stated herein, the Court denies Bills's consolidated motion for a judgment of acquittal and a new trial. (Dkt. No. 159.)

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: 8/16/2016